```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____9/20/19____
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HENRY T. LIEVRE AND DEBORAH M.
LIEVRE, *co-executors of the estate of Henry
E. Lievre*,

        Plaintiffs,

    -against-

JRM CONSTRUCTION MANAGEMENT,
LLC,

        Defendant.

17-CV-4439 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

    Henry E. Lievre filed this action against his former employer JRM Construction Management, LLC (JRM) on June 13, 2017, alleging that JRM terminated his employment on or about June 17, 2016, in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*; the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*; the New York State Human Rights Law (NYSHRL), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code § 8-101 *et seq.* On November 10, 2017, Lievre passed away. (Dkt. No. 18-1.) His claims are now pursued by the co-executors of his estate, Henry T. Lievre and Deborah M Lievre. (Dkt. No. 19.)

    Now before the Court is a motion by JRM for summary judgment (Dkt. No. 35) as to all of plaintiff's claims.[1] JRM argues that it never denied plaintiff any requested leave, that it never refused him any reasonable accommodation, and that it terminated his employment for poor performance. For the reasons set forth below, JRM's motion will be granted as to plaintiff's federal claims. His state and local claims will be dismissed without prejudice to refiling in state court.

---

[1] As used in this Opinion and Order, "plaintiff" refers either to Henry E. Lievre or to his estate, as context demands.

## I.     BACKGROUND

### A.     Procedural Background

Plaintiff commenced this action by filing a verified complaint (Dkt. No. 6) alleging that JRM terminated his employment because of his stomach cancer, thereby violating: (1) § 2612 of the FMLA, Ver. Compl. ¶¶ 60-65; (2) § 2615(a) of the FMLA, Ver. Compl. ¶¶ 66-73; (3) § 12112(a) of the ADA, Ver. Compl. ¶¶ 74-89; (4) §§ 290, 292, and 296 of the NYSHRL, Ver. Compl. ¶¶ 90-98; (5) § 8-107 of the NYCHRL, Ver. Compl. ¶¶ 99-106; (6) § 8-107(7) of the NYCHRL, Ver. Compl. ¶¶ 107-12; and (7) § 8-107(13) of the NYCHRL, Ver. Compl. ¶¶ 113-18.

Defendant filed its answer (Dkt. No. 13) on July 20, 2017. Defendant asserts, among other things, that its termination of plaintiff's employment was "based solely on legitimate, non-discriminatory factors," including plaintiff's failure to "perform[] his job duties at a level that met Defendant['s] reasonable and legitimate expectations of performance," and not on plaintiff's disability or request(s) for leave. Ans. at 11-12.

On March 15, 2018, the parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Dkt. No. 23.)

Discovery closed on December 14, 2018. (Dkt. Nos. 29, 30.) On February 22, 2019, defendant moved for summary judgment, filing a notice of motion (Dkt. No. 35); a memorandum of law (Dkt. No. 36); a statement of undisputed material facts pursuant to Local Civil Rule 56.1 (Def. 56.1 Stmt.) (Dkt. No. 37); and the declaration of Stephen A. Fuchs dated February 22, 2019 (Fuchs Decl.) (Dkt. No. 39), to which defendant attached excerpts of the depositions of Marc Reissman, JRM's Director of Estimating (and plaintiff's direct supervisor) (Reissman Dep.) (Dkt. No. 39-2), and Anna Levitt, JRM's Director of Human Resources (Levitt Dep.) (Dkt. No. 39-3), as well as various emails and other documents obtained through discovery.

Plaintiff responded on March 21, 2019, filing a memorandum of law (Dkt. No. 42); a Local Civil Rule 56.1 counter-statement of material facts, including a statement of additional material facts as to which plaintiff contends that there exists a genuine issue to be tried (Pl. 56.1 Stmt.) (Dkt. No. 43); and the declaration of John J. Appell dated March 21, 2019 (Dkt. No. 44), to which plaintiff attached further excerpts of the Reissman and Levitt depositions, the affidavit of plaintiff's father and co-executor Henry T. Lievre dated March 15, 2019 (Henry T. Lievre Aff.) (Dkt. No. 44-3), and additional emails and documents obtained through discovery.

On April 11, 2019, defendant filed a reply memorandum of law (Dkt. No. 46); its objections and responses to plaintiff's counter-statement of material facts (Dkt. No. 49); the affidavit of JRM's Project Manager Mohammad Durrani dated April 8, 2019 (Durrani Aff.) (Dkt. No. 47); and a second declaration of Stephen A. Fuchs (Fuchs Decl. II) (Dkt. No. 48), attaching one additional email from plaintiff.

### B. Facts

The following facts, taken from the evidence submitted in support of and in opposition to defendant's summary judgment motion, are undisputed unless otherwise indicated.

### 1. JRM Hires Plaintiff

JRM is a construction management company with offices in New York, New Jersey, and California. Def. 56.1 Stmt. ¶ 1[2]; Reissman Dep. at 7:25-8:6. Plaintiff began working at JRM as a

---

[2] Where plaintiff has not objected to the relevant paragraph of defendant's statement of material facts, this Opinion and Order cites only to defendant's statement.

Senior Estimator in May 2013. Def. 56.1 Stmt. ¶ 2; Fuchs Decl. Exs. F, V; Ver. Compl. ¶ 17.[3]

Before joining JRM, plaintiff informed the company – including his supervisor Marc Reissman –

that his cancer was in remission. Def. 56.1 Stmt. ¶¶ 3, 6; Reissman Dep. at 45:22-25; Ver. Compl.

¶ 15.

On May 15, 2013, plaintiff received JRM's Employee Handbook. Def. 56.1 Stmt. ¶ 14;

Fuchs Decl. Ex. E. The Employee Handbook sets forth JRM's anti-discrimination, reasonable

accommodation, and family and medical leave policies, as well as its Rules of Conduct. Def. 56.1

Stmt. ¶ 11; Fuchs Decl. Ex. D (Employee Handbook).

JRM's accommodation policy provided: "Pursuant to the Americans with Disabilities Act,

the Company will provide reasonable accommodation(s) to all qualified individuals with known

disabilities . . . where their disability affects the performance of their essential job functions, except

where doing [s]o would be unduly disruptive or would result in undue hardship." Employee

Handbook at 4; Def. 56.1 Stmt. ¶ 16. It also required that an employee give JRM at least thirty

days prior written notice of his or her need for medical leave, where foreseeable. Employee

Handbook at 20; Def. 56.1 Stmt. ¶ 17. It requested that employees use specific forms, available in

JRM's human resources department, to request leave. Employee Handbook at 20; Pl. 56.1 Stmt.

¶ 17. JRM also placed posters in common areas to inform its employees about their rights under

the FMLA. Def. 56.1 Stmt. ¶ 19; Levitt. Dep. at 146:23-147:15.

---

[3] A verified complaint may function as an affidavit at summary judgment. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (where plaintiff "verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true to the best of his knowledge," the "verified complaint is to be treated as an affidavit for summary judgment purposes"); *Rickett v. Orsino*, 2013 WL 1176059, at *2 n.5 (S.D.N.Y. Feb. 20, 2013) (construing plaintiff's verified pleading as an affidavit for purposes of summary judgment), *report and recommendation adopted*, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013).

## 2. Plaintiff's Health Issues in 2014

In 2014, plaintiff requested several weeks of leave from JRM, explaining that he required surgery to treat his cancer. Def. 56.1 Stmt. ¶ 23; Ver. Compl. ¶¶ 21-22. Though JRM concluded that plaintiff was not yet eligible for FMLA leave, it approved a short-term disability leave from March through May 2014. Def. 56.1 Stmt. ¶¶ 23-24; Levitt Dep. at 45:2-22; Fuchs Decl. Ex. F. According to HR Director Levitt, she also spoke with plaintiff about when he would be eligible to take leave under the FMLA. Def. 56.1 Stmt. ¶ 25; Levitt Dep. at 45:23-46:8.[4]

After plaintiff resumed work in May 2014, he was restored to his equivalent position and pay. Def. 56.1 Stmt. ¶ 26; Levitt Dep. at 45:6-10.

Plaintiff's health issues continued in late 2014, when plaintiff underwent radiation treatment and chemotherapy. Appell Decl. Ex. 8. The record contains no evidence that plaintiff requested FMLA leave in connection with these treatments. Nor did JRM deny plaintiff any requested FMLA leave. *See id.* It is undisputed, however, that during plaintiff's radiation treatment and chemotherapy he occasionally worked from home, with JRM's permission. Def. 56.1 Stmt. ¶ 43; Levitt Dep. at 162:8-19. For example, on September 8, 2014, plaintiff emailed his supervisor, Reissman, that he would be working from home on Monday and Tuesday of the following week, since his radiation treatment was "starting to take a toll" on him. Appell Decl. Ex. 8 at ECF page 3; *see also id.* at ECF pages 4-8. In addition, plaintiff was granted unpaid leave on various days in November and December 2014. Def. 56.1 Stmt. ¶ 33; Fuchs Decl. Ex. H.

---

[4] Plaintiff does not dispute that this conversation occurred. However, plaintiff points out, "[w]hile Ms. Levitt testified that Mr. Lievre knew he would be eligible for the [FMLA] leave because they spoke about it in 2013 she further testified that in 2014 she told Mr. Lievre he was not eligible for the FMLA, and she never told him he would be eligible for the FMLA after that." Pl. 56.1 Stmt. ¶ 25.

In or about December 2014, Reissman requested that plaintiff keep JRM's human resources department informed about his "work status." Fuchs Decl. Ex. W. On December 17, 2014, plaintiff emailed Levitt: "I wanted to keep you informed of my work status this week as [Reissman] requested I do a better job of. I had some health complications this week and needed to take some time to handle doctors appointments and procedures." *Id*. Notwithstanding Reissman's request, this was plaintiff's only status update to Levitt. After 2014, plaintiff never again discussed his health status with her. Def. 56.1 Stmt. ¶ 28; Levitt Dep. at 53:6-17, 155:6-14.[5]

### 3.    JRM's Accommodations

During plaintiff's employment, JRM provided several accommodations to address his health condition. For example, JRM offered plaintiff reimbursement for taxis to attend offsite "walk throughs," notwithstanding that JRM's other Estimators were required to take public transportation to walk throughs. Def. 56.1 Stmt. ¶ 39; Levitt Dep. at 80:19-24. JRM also offered plaintiff a car service, beginning in August 2014, to commute between work and home, though plaintiff only used that service for one month, Def. 56.1 Stmt. ¶¶ 40-42; Reissman Dep. at 170:16-171:9; Levitt Dep. at 80:15-19, 81:5-8, and permitted plaintiff to work from home whenever necessary. Def. 56.1 Stmt. ¶ 43; Reissman Dep. at 179:2-21; Levitt Dep. at 162:13-19.

At plaintiff's request, JRM converted a women's bathroom into an additional ADA-compliant bathroom. Def. 56.1 Stmt. ¶ 44. The new bathroom was larger in size than the two other ADA-compliant bathrooms already maintained by JRM. *Id*.; *see also* Reissman Dep. at 171:10-24; Levitt Dep. at 80:24-81:2.

---

[5] Once again, plaintiff does not directly dispute these facts. Instead, plaintiff objects that "[t]his email of December 17, 2014 which is referenced by Ms. Levitt in her testimony was only being used for Mr. Lievre to state when he would be in or out of the office not what his health condition was." Pl. 56.1 Stmt. ¶ 28.

### 4.      Plaintiff's Health Issues and Work Performance in 2015

In 2015, plaintiff's health appears to have improved, for a time. He received paid leave for medical procedures on January 15 and 16, and again on May 8, *see* Def. 56.1 Stmt. ¶ 32; Fuchs Decl. Ex. G, but did not take any further leave in 2015. On July 17, 2015, plaintiff emailed Reissman and others with the subject "Good news": "Hey guys just wanted to share the good news with you, my scans came back clear from Sloan! I live to fight another day, to crack another joke and to eat another piece of bacon!" Fuchs Decl. II Ex. X.

However, plaintiff's supervisors began to express concerns about his work performance. Over the course of his first two years at JRM, plaintiff was late to the office on a number of occasions. *See* Fuchs Decl. Ex. L (collecting emails in 2013, 2014, and 2015 from plaintiff informing Reissman that plaintiff would be late to the office). On January 28, 2015, when plaintiff again emailed Reissman to inform him that he would be late, Reissman replied: "Henry, As I have told you a million times you need to be here on time. If it was just today I would be okay with this but it is now becoming a habit. If it were me I would know the trains would be messed up today and I would have made sure I was on the early train." *Id.* at ECF page 31.

Plaintiff's supervisors also noted issues with the work product he delivered to JRM's clients, including its client Blackstone. For example, after plaintiff emailed Blackstone on June 17, 2015, attaching "revised budgets," Blackstone employee Anthony Riccio forwarded that email to another JRM employee, writing: "The numbers are ridiculous, if you guys do not plan on visiting the site to get the right scope priced then I will go elsewhere my time is being waste again. Need someone here the give me a revised cost that make sense, need revise cost by noon." Fuchs Decl. Ex. P (spelling and grammar in original).

Plaintiff's 2015 performance review, which was submitted by Reissman on or about August 3, 2015, reflected these issues. Def. 56.1 Stmt. ¶ 48; Fuchs Decl. Ex. J (2015 Performance Review). On a scale of 1-5, plaintiff received four ratings of 4 ("above average"), five ratings of 3 ("satisfactory"), and four ratings of 2 ("below average"). *See* 2015 Performance Review at 1-3. For example, Reissman noted that plaintiff "does a decent job" with his "review of drawings," "but misses a bunch of scope." *Id.* at 1. He gave plaintiff a "below average" rating on his "RFIs" (requests for information), noting: "Does them but not a great quantity or detail." *Id.* He also rated plaintiff as "below average" in the categories of "CM Leveling Sheets," "Interaction with Construction Department," and "Communication and Teamwork." *Id.* at 2-3. In his narrative notes, Reissman wrote that plaintiff "[n]eeds a little more quality a little less quantity" and that, as to plaintiff's "Communication and Teamwork," "[t]his would be his strong suit except [he] doesn[']t let you know about a problem until it[']s too late." *Id.* at 3.

Reissman also specifically identified plaintiff's issues working with Blackstone, noting that his "Interaction with Construction Department" was "[o]verall good everyone likes him but we had to talk about his lack of detail at Blackstone and the team was upset." 2015 Performance Review at 2.[6]

After the 2015 Performance Review was submitted, plaintiff's issues with Blackstone continued. On August 12, 2015, plaintiff emailed Riccio, at Blackstone, to address an issue Riccio had been upset about:

> Just sat with Danny and he told me about [sic] you were upset with my email response to Rimi. I was in no way trying to say that you were holding up the process and apologize if my email came off in that way. . . .

---

[6] In its counter-statement of material facts, plaintiff highlights the positive elements of Lievre's 2015 Performance Review. *See* Pl. 56.1 Stmt. ¶ 48. Neither party has offered any comparative data (for example, Lievre's earlier performance reviews, or ratings given to other Senior Estimators).

As always, please let me know if there is anything you need, and I hope you find my paperwork to you has been up to the level you have come to expect.

Appell Decl. Ex. 6. On November 20, 2015, plaintiff emailed Riccio again, attaching change orders. Riccio responded:

I have to say I am totally blown away with this proposal, $400K for one room ???? I can't believe the amount of P/T and O/T posted within the sub costs for a room that was totally under JRM's control. $40K in drywall to build (3) walls a lay in ceiling with some GWB boarders ????? One lump sum of $32,465 for (68) for light fixtures. I am shocked.

Fuchs Decl. Ex. Q. Later the same morning, in response to another email from plaintiff attaching change orders, Riccio emailed again: "I am not sure how this change order is $81,834 over posted project budget ???" Fuchs Decl. Ex. R.

### 5. Plaintiff's Health Issues and Work Performance in 2016

On November 16, 2015, plaintiff emailed Reissman, stating that he had just gotten a call from his oncologist who asked plaintiff to attend "an emergency consult with radiation and neurosurgery" because they had found something on plaintiff's spine. Appell Decl. Ex. 11.

On March 7, 2016, plaintiff emailed Reissman that he was "not feeling well" and would not be coming into work, to which Reissman replied, "Feel better I have copied HR," and copied Levitt. Appell Decl. Ex. 9. Two days later, plaintiff emailed Reissman that he needed to leave at 4:00 p.m. for "some testing up at Sloan" (meaning Memorial Sloan Kettering Cancer Center). *Id.* at ECF page 4. On March 28, 2016, plaintiff emailed Reissman that he would need to leave at 4:00 p.m. again "to start the process for treatment up at [S]loan," and, later that day, that he would be getting his "schedule for radiation" and would "do [his] best to keep it manageable for everyone." *Id.* at ECF page 7. Plaintiff began radiation treatment at some point thereafter – the record does not reflect exactly when – and continued that treatment until April 18, 2016. *Id.* at ECF page 9.

Meanwhile, plaintiff's work performance continued to suffer. On March 18, 2016, another employee at JRM emailed plaintiff with the subject "Blackstone 15-015," stating "When can the balance of COs be priced? This is holding up the closing of the project. Work has been performed." Fuchs Decl. Ex. U. When plaintiff responded that he was "reviewing all change orders and going over completion dates with Mohammed [Durrani] today," the employee responded "I know. When can they be completed? Need them. Months old." *Id.*

Plaintiff's performance issues with Blackstone came to a head when Blackstone requested that plaintiff be removed from its project. According to Mohammed Durrani, who was JRM's Blackstone project manager:

> 3. Throughout his work on the Blackstone Project, Henry displayed a clear lack of effort and diligence. The client, the subcontractors and I were constantly waiting for overdue budgets from Lievre at any stage of the project in which he was involved. The budgets Henry prepared were estimates for refining the scope of various aspects of the Blackstone Project. When Henry's budgets were eventually received, they were always much too low, and as a result the costs of the project would wind up being highly over budget. . . . In reality, the cost of the project could be as much as twice the budget estimate Henry prepared.

> 4. Blackstone, through its Senior Vice President of Global Design and Construction, Anthony Riccio, expressed its frustration with the situation numerous times. Mr. Riccio was frequently exasperated, and did not understand why the budget was always way off, despite the project being the same. Once I became Project Manager for the Blackstone Project [in late 2015,] I received direct criticism from Mr. Riccio regarding the inaccurate budgets, which made me look bad both to JRM's client and to my supervisors.

> 5. On several occasions after I took over as Project Manager for the Blackstone Project I spoke to Marc Reissman, the Director of Estimating and Henry's direct supervisor, about the problems Henry's tardy and inaccurate work had caused me in managing the project and in managing the relationship with Blackstone.

> 6. Mr. Riccio requested that Henry be removed as the estimator assigned to the Blackstone Project, and that a different estimator be assigned. Because of this request Henry was removed from the project as of early April, 2016.

Durrani Aff. ¶¶ 3-6.[7]

On Wednesday, April 6, 2016, Reissman sent an email to Levitt with the subject "Henry Lievre & Job Performance," and wrote, "On Monday I spoke with Henry about his performance. He was asked to be removed from the Blackstone account by the client. He was not getting things done and the client was upset. This is now the third conversation had with Henry about his performance." Fuchs Decl. Ex. K. When Reissman was asked at deposition why he gave plaintiff a warning at that time, he explained:

> I don't know the dates, but throughout his tenure at JRM, I had several conversations with him in my office, going through his work, getting things done, getting things done properly. And he got thrown off of Black[s]tone. Like I said, we didn't let him go [at that time] because we wanted to afford him every opportunity, and I tried to put him on other things . . .

> And he didn't, he didn't get things done properly. I remember one night I had to spend about two hours correcting all his work for Group M [another client of JRM's]. It was plumbing and sprinklers. It was in bad shape, and we had to get the budget out, and the rest of my team had been working really hard, and I had to jump in and fix all the mistakes Henry made, and they were just careless, careless mistakes.

---

[7] Defendant submitted Durrani's affidavit for the first time in its reply papers. The Court may consider evidence introduced for the first time on reply where that evidence addresses "new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226-27 (2d Cir. 2000) (quoting *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220, 1235 (S.D.N.Y. 1991), *rev'd on other grounds,* 967 F.2d 742 (2d Cir. 1992)). "A district court enjoys broad discretion . . . to rely on evidence submitted with the reply papers." *Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela*, 341 F. App'x 722, 724 (2d Cir. 2009). Factors to consider include whether the opposing party was surprised by the new evidence in question, whether it sought – or, as here, failed to seek – leave to respond to the newly-introduced evidence, and whether it claimed to have contrary evidence to introduce. *Bayway Ref. Co.*, 215 F.3d at 227. In this case, the Durrani Affidavit was submitted in response to plaintiff's arguments that Reissman's testimony about Blackstone's discontent with plaintiff constituted inadmissible hearsay. Pl. 56.1 Stmt. ¶¶ 55, 88 n.3. Given plaintiff's failure to "seek a timely remedy for any injustice," *Bayway Ref. Co.*, 215 F.3d at 227, the Court will exercise its discretion to consider the Durrani Affidavit. *See also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) ("In any event, it is hard for Ruggiero to claim unfair prejudice now, because she could have claimed surprise in the district court and sought to file a responsive sur-reply.").

Reissman Dep. at 157:6-23.

On April 7, 2016 (a few days after Reissman spoke with Lievre about the Blackstone problems), JRM employee Anthony Iandoli sent an email asking if certain paperwork had been completed. In response, plaintiff emailed the Blackstone team, saying, "No I had a bad paperwork day today." Appell Decl. Ex. 10.

On April 25, 2016, Reissman sent another email to Levitt, this time with the subject line "Henry Lievre- Last opportunity":

> I am just sending this email as a report. I spoke with Henry on Thursday 4/21/16 as a last warning. I told him we spoke to him numerous times about his work performance and reiterated my meeting with him and Anthony Iandoli that happened months ago. I told him after getting thrown off of the Blackstone account he should have been rightfully been fired. I also told him we would keep him for one final chance because we like him as a person. However that being said this will be Henry's final chance. If he does not do an adequate job then he will be fired.

Fuchs Decl. Ex. N.

After plaintiff's performance failed to improve, *see* Reissman Dep. at 173:16-25, JRM terminated plaintiff's employment on or about June 17, 2016. Ver. Compl. ¶¶ 46-52. Reissman testified that the "four main reasons" for JRM's termination of plaintiff were poor performance, tardiness, late work, and errors in his work. Reissman Dep. at 95:2-96:6.

### 6. The Henry T. Lievre Affidavit

On March 15, 2019, Henry T. Lievre – plaintiff's father and co-executor of his estate – executed an affidavit averring to his perception of plaintiff's decline in health in early 2016:

> In March 2016 his cancer condition had worsened and he was then required to start radiation at the end of March 2016. I was involved in this process with him in that I would provide transportation for my son to and from these treatments, stay with him during these treatments and care for him afterwards. This radiation treatment lasted for weeks. During this radiation treatment I observed my son on an almost daily basis. He was exhausted, tired, sick, weak and physically not well. However he continued to work full-time for the defendant including working late into the

evening so he would not fall behind on his work. He also scheduled medical appointments during lunch hours, after work and Friday evenings for treatment so as not to interfere with work and give him some time to recuperate over the weekend.

Henry T. Lievre Aff. ¶ 9. According to Mr. Lievre, it would have been obvious to anyone who interacted with plaintiff from March to June 2016 that his poor work performance – if such a thing occurred – was attributable to a decline in his health:

> If, indeed, his performance suffered during this period, it was evident to me, and would have been evident to anyone who saw my son during this period, that any deterioration of his performance resulted from the exhaustion, weakness and stress of his ongoing radiation treatment for cancer. On occasions when I picked my son up from work during this period, his supervisor and co-workers would ask how his treatment was going, and I have seen an e-mail sent on March 28, 2016, to his superiors, indicating that he was returning to cancer treatment at Sloan Kettering, so his employer was aware of his radiation treatment, and thus knew or should have known that any performance difficulties he was having resulted from this radiation treatment. Despite this fact, his superiors never told him he had the option of paid Family Medical Leave Act leave, or informed him of any other options or accommodations that were available to him during this period. They just terminated him.

*Id.* ¶ 13.

Mr. Lievre attests that plaintiff was scheduled to begin another round of chemotherapy on or about the date he was terminated from JRM. *Id.* ¶ 10; *see also* Ver. Compl. ¶ 37 ("on or about June 17, 2016, the plaintiff was scheduled to start . . . three (3) to five (5) weeks of chemotherapy"). However, there is no evidence that plaintiff ever communicated that fact to JRM.[8]

---

[8] Plaintiff's pleading asserts that at an unspecified time between April and June 2016, he informed unspecified "officers, directors, supervisors, managers, employees and/or agents" of JRM that he would "ultimately" require three to five weeks of chemotherapy and "may require leave" pursuant to the FMLA. Ver. Compl. ¶ 36. However, these allegations are too vague and conclusory to be admissible, and thus do not raise a triable issue of fact in opposition to defendant's summary judgment motion. *See Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) ("Reliance upon conclusory statements or mere allegations is not sufficient to defeat summary judgment.") It is presumably for this reason that plaintiff's counter-statement of material facts asserts only that "Henry T. Lievre testified that his son was re-commencing chemotherapy treatment on the date he

## 7.     JRM's Leave Granted to Plaintiff and Others

There is no evidence in either party's summary judgment papers that JRM ever denied a request by plaintiff to take time off in connection with his illness or treatment, or discouraged him from taking time when necessary. *See* Def. 56.1 Stmt. ¶ 37 (plaintiff "was never denied any time off in connection with his health condition or his treatment"); Reissman Dep. at 171:25-172:9. On the contrary: it is undisputed that whenever plaintiff requested leave for his medical condition, JRM granted that leave. Pl. 56.1 Stmt. ¶¶ 30-37. Indeed, both before and after his short-term disability leave in 2014, JRM granted plaintiff's written requests for paid leave on numerous days from 2013 through 2015 when plaintiff did not feel well, needed time off, or needed to leave early as a result of his medical condition or for treatment, including on November 15-20, 2013; February 4 and 28, March 21, and July 16, 2014; and January 15-16 and May 8, 2015. Def. 56.1 Stmt. ¶ 32; Fuchs. Decl. Ex. G. In addition, JRM granted plaintiff's written requests for unpaid leave on November 18, 2014, and between December 29, 2014 and January 1, 2015. Def. 56.1 Stmt. ¶ 33; Fuchs. Decl. Ex. H. JRM also granted various informal requests for leave (requests that plaintiff made outside of JRM's regular "portal" for such requests), including, for example, his request to leave early on March 28, 2016. Def. 56.1 Stmt. ¶ 34; Fuchs Decl. Ex. I; Appell Decl. Ex. 9.

Aside from these requests – all of which were granted – plaintiff never told JRM that he needed to take additional leaves of absence in connection with his illness or treatment. Def. 56.1 Stmt. ¶ 35; Reissman Dep. at 171:25-173:9. From his last day of radiation on April 18, 2016, though his termination in June 2016, there is no evidence that plaintiff requested leave (under the

---

was terminated." Pl. 56.1 Stmt. ¶ 104. Plaintiff does not assert, anywhere in that counter-statement, that plaintiff ever told JRM that he required chemotherapy in 2016.

FMLA or otherwise) in connection with any further treatment, nor that he requested any additional accommodations. Def. 56.1 Stmt. ¶¶ 35-37; Reissman Dep. at 172:10-173:3.

Meanwhile, during the time plaintiff was employed, JRM granted leave to two other employees with cancer. One of those employees, Kirit Upadhyaya, was an Estimator – the same position as plaintiff – who was also supervised by Reissman. Def. 56.1 Stmt. ¶¶ 72-73; Levitt Dep. at 156:5-159:23. When Upadhyaya approached Levitt to discuss his medical condition, she advised him that he was eligible for FMLA leave, and he applied for and was granted leave for a period between March and August 2016. Def. 56.1 Stmt. ¶ 74; Levitt Dep. at 158:16-159:14. The other employee with cancer who required leave was a construction superintendent, who was granted leave in 2014 and again in 2016. Def. 56.1 Stmt. ¶ 75; Levitt Dep. at 160:6-25.

## II. ANALYSIS

### A. Legal Standards

#### 1. Summary Judgment Standard

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Amaker v. Foley*, 274 F.3d 677, 680-81 (2d Cir. 2001). A dispute is genuine if there is evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If, on the other hand, no reasonable jury could rule for the non-moving party based on the evidence presented, then summary judgment must be granted. *Id.* at 254.

The moving party bears the initial burden of identifying the parts of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). The court

must then "examin[e] the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial," *Amaker*, 274 F.3d at 681, with "the inferences to be drawn from the underlying facts . . . viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). *See also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (on summary judgment, "a Court is 'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment'" is sought).

If the moving party meets its initial burden, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). The non-moving party must present evidence upon which the jury could reasonably find in his favor. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful").

In employment discrimination suits where the "merits turn on a dispute as to the employer's intent," courts exercise caution in granting summary judgment motions. *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). "Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citations and internal quotation marks omitted). "Purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to survive summary judgment. *Cameron v. Cmty. Aid For Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Courts should view the record "as a whole" to determine whether a jury could reasonably find a discriminatory purpose by the employer. *Walsh v. N.Y. City Housing Auth.*, 828 F.3d 70, 76 (2d Cir. 2016). "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." *Id.*

### 2. Local Civil Rule 56.1

In this District, Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs," of the material facts that the moving party contends to be undisputed, with citations to the underlying evidence. The non-moving party must then respond in kind, with numbered paragraphs that correspond "to each numbered paragraph in the statement of the moving party." Local Civ. R. 56.1(b). The non-moving party may also provide "a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.*

To the extent not "specifically controverted" by the non-moving party, the statement of material facts submitted by the moving party will be "deemed to be admitted for purposes of the motion." Local Civ. R. 56.1(c); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). Each statement "controverting any statement of material fact" must be "followed by citation to evidence which would be admissible." Local Civ. R. 56.1(d); *see also Hill v. Bloomberg L.P.*, 2016 WL 1665599, at *2 (S.D.N.Y. Apr. 20, 2016) (deeming admitted "any factual assertion[] made by [defendant] that is supported by competent evidence in the record, and that is not disputed by competent, admissible, testimonial facts (as opposed to conclusory assertions or argument)" in plaintiff's opposition papers).

By the same token, the moving party's "allegations of uncontested fact cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). The court may and should disregard assertions made in a Local Rule 56.1 statement if they are not supported by citations to admissible evidence. *Id.*; *see also Giannullo*, 322 F.3d at 140.

### 3.    The FMLA

The FMLA gives eligible employees an "entitlement" to twelve work weeks of unpaid leave per year for the purposes specified in the statute, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "FMLA claims come in at least two varieties: interference and retaliation," *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017):

> In a general sense, an employee brings an "interference" claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA. []. "Retaliation" claims, on the other hand, involve an employee actually exercising her rights . . . and then being subjected to some adverse employment action by the employer. []. The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA.

*Id.* (citations omitted).

#### a.    *Interference*

To prevail on an FMLA interference claim, a plaintiff must establish "'(1) that she is an "eligible employee" under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) that defendants denied her benefits to which she was entitled by the FMLA.'" *Esser v. Rainbow Advert. Sales Corp.*, 448 F. Supp. 2d 574, 580 (S.D.N.Y. 2006) (quoting *Kennebrew v. N.Y.C. Hous. Auth.*, 2002 WL 265120, at *19 (S.D.N.Y. Feb. 26, 2002)); *see also Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016) (same).

### b.    Retaliation

FMLA retaliation claims are subject to the burden shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *O'Reilly v. Consol. Edison Co. of New York,* 173 F. App'x 20, 22 (2d Cir. 2006) (collecting Second Circuit authority applying *McDonnell Douglas* burden shifting to FMLA retaliation, ADA, NYSHRL, and NYCHRL claims).[9] Under *McDonnell Douglas*, as applied to a plaintiff's termination of employment: a plaintiff must establish "a prima facie case of FMLA retaliation"[10]; "the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions"; and "the burden shifts back to the plaintiff to demonstrate that the employer's reason was pretextual," *Douyon*, 665 F. App'x at 56-57 (citations omitted), and "that the true reason for defendant's action was discriminatory and/or FMLA retaliatory animus." *McFarlane v. Chao*, 2007 WL 1017604, at *1 (S.D.N.Y. Mar. 30, 2007).

### c.    Plaintiff's Burden

Regardless of whether a plaintiff pursues his FMLA claim under a theory of interference or retaliation, that plaintiff has the burden of establishing either "that defendants denied [him] benefits to which [he] was entitled by the FMLA" (to support an interference claim), *Esser*, 448 F. Supp. 2d at 580, or that the defendant's "reasons for termination were pretextual" (to support a retaliation claim), *Hockenjos v. MTA Metro-N. R.R.*, 695 F. App'x 15 (2d Cir. 2017), and that in reality his exercise of his FMLA rights was a "motivating factor" in the termination decision. *Woods*, 864 F.3d at 168-69; *see also Sista*, 445 F.3d at 176 ("Regardless of whether Sista asserts

---

[9] FMLA interference claims are not governed by *McDonnell Douglas* analysis. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006).

[10] "To establish a prima facie case of FMLA retaliation, a plaintiff must show that: 1) she exercised rights protected under the FMLA; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Douyon v. New York City Dep't of Educ.*, 665 F. App'x 54, 56-57 (2d Cir. 2016).

an 'interference' or a 'retaliation' claim, he cannot show that CDC considered his FMLA leave and request to return a negative factor in its decision to terminate him."). The timing of an employee's termination, standing alone, is not sufficient to discharge that burden. *Dearden v. GlaxoSmithKline LLC*, 2017 WL 4084049, at *11 (S.D.N.Y. Sept. 14, 2017) (quoting *Vosatka v. Columbia Univ.,* 2005 WL 2044857, at *10 (S.D.N.Y. Aug. 25, 2005)) ("[t]he timing of events alone, even if sufficient to meet the plaintiff's *prima facie* burden, cannot defeat summary judgment in the face of defendant's proffered legitimate reason").

### 4. The ADA

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A covered employer also has an obligation to provide a disabled employee with reasonable accommodations, unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." *Id.* § 12112(b)(5)(A).

In this case, plaintiff asserts, and defendant does not contest, that his cancer condition – which JRM was aware of – constituted a disability for purposes of the ADA. *See* Opp. Mem. at 17 (arguing that JRM was aware of plaintiff's disability and had a duty to accommodate it); Def. Reply Mem. at 7 (conceding that "JRM was aware of" plaintiff's disability but contending that it "accommodated [that] disability from the onset of his employment").

However, "[t]he ADA does not prevent an employer from holding an employee accountable for poor job performance." *Jacobson v. Capital One Fin. Corp.*, 2018 WL 6817064, at *16 (S.D.N.Y. Dec. 12, 2018). Even if a plaintiff's unacceptable job performance is caused by

his disability, an employer may still "hold a disabled employee to legitimate performance expectations, as long as the employee has the same opportunity to succeed as nondisabled employees do." *Id.* (collecting cases); *Corr v. MTA Long Island Bus*, 27 F. Supp. 2d 359, 369 (E.D.N.Y. 1998) ("Plaintiff's disability . . . may not be used to shield him from the adverse consequences of inadequate job performance."), *aff'd*, 199 F.3d 1321 (2d Cir. 1999). "When a defendant demonstrates that an adverse consequence was taken due to plaintiff's poor performance, the plaintiff must show that he or she suffered an adverse consequence *because of* the disability as opposed to the poor performance, to succeed with a claim under the ADA." *Jacobson*, 2018 WL 6817064, at *16 (emphasis in original) (collecting cases).

Plaintiff's ADA claim, as asserted in his pleading, includes a variety of sub-claims. He alleges that "Defendant excluded or otherwise denied the Plaintiff an equal job and/or benefits to a qualified individual because of the Plaintiff's known disability"; that "Defendant wrongfully terminated the Plaintiff because of the Plaintiff's known disability"; that "Defendant wrongfully retaliated against the Plaintiff because of the Plaintiff's known disability and/or his opposition to such discrimination"; that "Plaintiff suffered an adverse employment action from the Defendant because of his known disability"; that "Defendant failed to engage in the interactive process with the Plaintiff within the meaning of the ADA"; and that "Defendant failed to provide the Plaintiff with a reasonable accommodation within the meaning of the ADA." Ver. Compl. ¶¶ 78-83. In his summary judgment brief, however, plaintiff presses only one of his ADA sub-claims: his failure to accommodate claim. Opp. Mem. at 15. Therefore, his other ADA claims are deemed abandoned. *Bellegar de Dussuau v. Blockbuster, Inc.*, 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006); *Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases).

Claims of disability discrimination under the ADA are also "governed by the familiar burden-shifting framework" of *McDonnell Douglas*. *Jacobson*, 2018 WL 6817064, at *16. "[A] plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing each of the following: '(1) [p]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96-97 (2d Cir. 2009) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006)).

If a plaintiff makes that initial showing, the burden shifts to the employer to demonstrate undue hardship in making a reasonable accommodation, *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (in a failure to accommodate case), or evidence of a legitimate non-discriminatory reason for the discharge, *McBride*, 583 F.3d at 96 (in a wrongful termination case). "If the defendant meets this burden, 'the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext.'" *Jacobson*, 2018 WL 6817064, at *16 (quoting *Sista*, 445 F.3d at 169). The plaintiff has the ultimate burden of persuasion, *id.*, and "[t]he burden of persuasion on the 'existence' of an 'effective accommodation' is not satisfied by mere speculation." *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000).

## B.    Application

As noted above, plaintiff does not defend his retaliation claims under the FMLA or the ADA (nor, for that matter, does he defend his retaliation claims under state or local law). *Cf.* Ver. Compl. ¶¶ 69, 80, 84-85, 93-94, 109. Indeed, his opposition brief does not contain the word retaliate. Instead, plaintiff defends his FMLA interference claim; his accommodation claim under

the ADA; and his accommodation and iterative process claims under the NYSHRL and NYCHRL. Opp. Mem. at 3-24. I address each in turn.

### 1. FMLA Interference Claim

To defeat summary judgment, a plaintiff must present a genuine issue of material fact as to each unconceded element of an FMLA interference claim. Those elements are: "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio*, 817 F.3d at 424.

In this case, defendant concedes the first two elements, *see* Def. Mem. at 20-22; Opp. Mem. at 3, and neither party addresses whether plaintiff was entitled to take leave under the FMLA. The Court therefore assumes, for purposes of the pending motion, that plaintiff can satisfy the third element. Defendant contends that it is entitled to summary judgment on the fourth and fifth elements because plaintiff "never requested FMLA leave, and never gave notice he required any leave in connection with his illness prior to his termination," and therefore that plaintiff has "failed to establish he was ever denied benefits to which he was entitled under the FMLA." Def. Mem. at 20. To the extent plaintiff's FMLA claim challenges his termination, defendant further contends that he has failed to point to any evidence showing that his undisclosed desire to take leave "constituted a negative factor in the decision to terminate [him]." *Id.* at 21 (quoting *Sista*, 445 F.3d at 175-76).

Plaintiff concedes that JRM never denied him "any time off in connection with his health condition or his treatment," that he "never expressed that he needed to take additional leave of absences" (in addition to the eight periods of leave and/or absence JRM did afford him) "in

connection with his treatment, cancer or condition," and that he never expressed to JRM "that he would need an additional leave of absence in late April or July of 2016." Pl. 56.1 Stmt. ¶¶ 30-37. However, plaintiff argues, JRM knew or should have known about his need for additional leave, even though he never asked for such leave or notified JRM of his intention to take it. Opp. Mem. at 3-5, 7-14. Plaintiff also argues that JRM knew or should have known that his poor performance was caused by the same medical condition that entitled him to leave. *Id.* at 5-7, 14. Therefore, plaintiff suggests (though he does not expressly make this point in his brief) that "there is an issue of fact as to whether the firing . . . constituted interference with [an] attempt to exercise rights under the FMLA." *Garraway* v. *Solomon R. Guggenheim Found.*, 415 F. Supp. 2d 377, 384 (S.D.N.Y. 2006).

For the reasons set forth below, the Court concludes that plaintiff has failed to raise a genuine issue of material fact concerning the fourth and fifth elements of his FMLA interference claim: that he "gave notice to the defendant of [his] intention to take leave" and that he "was denied benefits to which [he] was entitled under the FMLA." *Graziadio*, 817 F.3d at 424.

> a. ***Plaintiff Has Not Raised a Triable Issue of Fact as to the Fourth Element of His FMLA Interference Claim***

Under applicable FMLA regulations (and JRM's internal policies), "[a]n employee must provide the employer at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable" or, "[i]f 30 days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable." 29 C.F.R. § 825.302(a). *See also* Employee Handbook at 20. "An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act" or "even mention the FMLA to meet his or her obligation to provide notice." 29 C.F.R. § 825.301(b). *See also Debell v. Maimonides Med. Ctr.*,

2011 WL 4710818, at *6 (E.D.N.Y. Sept. 30, 2011) ("An employee is not required to request FMLA leave by name."). But the employee must clearly communicate the need for time off. "[A]n 'employer is not required to be clairvoyant.'" *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 409 (S.D.N.Y. 2007) (quoting *Johnson v. Primerica*, 1996 WL 34148, at *5 (S.D.N.Y. Jan. 30, 1996)). Thus, "[t]he critical question is whether information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Ode v. Mount Sinai Med. Ctr.*, 2006 WL 1711508, at *5 (S.D.N.Y. June 22, 2006) (quoting *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005)).

Where the undisputed evidence shows that an employee failed to notify his employer of his intention to take leave, courts do not hesitate to grant summary judgment on that employee's FMLA interference claim. *See, e.g.*, *Nally v. New York*, 2013 WL 2384252, at *15 (N.D.N.Y. May 30, 2013) ("Based upon the facts and the statute, the Court finds that plaintiff failed to establish that she adequately notified defendants of that she was entitled to and was requesting FMLA leave."); *Yanklowski v. Brockport Cent. Sch. Dist.*, 794 F. Supp. 2d 426, 428 (W.D.N.Y. 2011) ("Plaintiff has not produced any evidence that she was denied any benefit to which she was entitled or that she was planning to make a further request for leave . . . ."); *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 194 (S.D.N.Y. 2011) (dismissing FMLA interference claim where plaintiff failed to "satisfactorily allege either that he gave [the defendant] notice of an intention to take FMLA leave, or that any such request was denied"). Similarly, where the record reflects that an employer granted every request by an employee for leave, and "there is no evidence that he was discouraged or penalized for taking such leave," summary judgment is warranted. *Woolf v. Bloomberg L.P.*, 2019 WL 1046656, at *18 (S.D.N.Y. Mar. 5, 2019).

Notwithstanding plaintiff's admission that he never requested (and was never denied) any leave under the FMLA, he asserts that JRM's "knowledge of [his] qualifying condition, in combination with requests for leave and sick days," creates a genuine issue of fact "as to whether defendant was put on inquiry notice of plaintiff's request for leave." Opp. Mem. at 3-4 (quoting *Debell*, 2011 WL 4710818, at *8).

Neither *Debell* nor the other cases on which plaintiff principally relies – *Barnett v. Revere Smelting & Ref. Corp.*, 67 F. Supp. 2d 378 (S.D.N.Y. 1999), and *Garroway* – assist him in resisting summary judgment. The plaintiff in *Debell* was a hospital employee who experienced a psoriasis flare-up. On Friday, April 3, 2009, he "showed his supervisors his psoriasis sores" and "informed several of his supervisors . . . that he was unable to continue working in the sterilization unit." 2011 WL 4710818, at *8. The hospital "advised [him] to leave for the day and suggested that he see his doctor." *Id.*, at *7. On Monday morning, April 6, 2009, he met with the Executive Director for Perioperative Surgical Services and "requested to go to the doctor, who would be able to 'give him treatments where he might be able to perform his job.'" *Id.* Instead, he was "terminated at the meeting." *Id.* On these facts – including direct evidence that plaintiff showed his psoriasis sores and "asked for time off to see his doctor" just before he was fired, *id.*, at *8, the court held that he had raised a genuine issue of material fact as to whether his employer was on notice of his need for an FMLA leave. *Id.*, at *7-8.

In *Barnett*, the plaintiff was a refinery worker with a heart condition. He was terminated for "excessive absenteeism" after he (i) showed his employer's on-site nurse his prescription for Procardia (a chest pain medication); (ii) mentioned his chest pains to his manager and union steward; (iii) told his manager "that he had been diagnosed with a 'serious heart condition'"; and (iv) called in sick for two days, explaining by telephone that he was "suffering from chest pains

and difficult breathing." 67 F. Supp. 2d at 382-83. The court found that plaintiff had raised a question of fact as to whether his communications "should have given Revere reason to conclude that his absence was due to his 'serious health condition' under the FMLA." *Id.* at 387.

In *Garroway*, the defendant – a museum – knew that plaintiff had been hospitalized from February 28 to March 7, 2005, because he was hearing voices. 415 F. Supp. 2d at 380-84. At summary judgment, the museum argued that plaintiff "never requested or informed it of any need for FMLA leave *after* he was discharged from the hospital on March 7 and that it therefore was within its rights in firing him for failing thereafter to comply with its absence policy." *Id.* at 383 (emphasis added). However, plaintiff presented evidence that he had called museum employees on March 8 and 11 (*after* his release from the hospital) and informed them that he was still seeking a doctor's "release to come back to work." *Id.* at 381. On those facts, the court concluded that "a jury reasonably could find" that, after that call, the museum "was on sufficient notice to give rise to a duty to ascertain whether further leave was required." *Id.* at 384.

None of these cases assists plaintiff Lievre in creating a genuine issue of material fact. In *Debell*, *Barnett*, and *Garroway*, the plaintiffs were actually absent from work when they were let go (or had requested to be absent); the issue in dispute was whether their employers had sufficient notice that the condition necessitating those absences triggered the FMLA. Here, conversely, it is undisputed that JRM was aware that plaintiff had cancer. In fact, it knew about that condition when it hired him, Def. 56.1 Stmt. ¶¶ 3, 6, and it granted plaintiff all of the leave he requested related to that condition over the three years that he was employed by JRM. *Id.* ¶¶ 32-34. It is also undisputed, however, that at the time he was fired plaintiff had completed his course of radiation therapy (without seeking or taking a leave), was working full time, and had *not* requested any future medical leave. Def. 56.1 Stmt. ¶¶ 35-37; Appell Decl. Ex. 9 at ECF page 9; Reissman Dep. at

134:2-8, 172:5-173:3. Since plaintiff did not give JRM notice, either directly or indirectly – by being absent due to illness – that he "was unable to continue working," *cf. Debell*, 2011 WL 4710818, at *8, his FMLA interference claim fails.

Plaintiff argues that his supervisors should have inferred his future need for FMLA leave in the summer of 2016 – or at least asked him whether he would need such leave – because they knew that he had cancer, knew that he had recently completed a course of radiation, and knew that he had experienced "significant side effects" two years earlier from the radiation and chemotherapy treatment he had been given in September 2014. Opp. Mem. at 13-14; *see also* Appell Decl. Ex. 8. Notwithstanding those side effects, however, plaintiff did not take any extended leave during his 2014 treatment. *See* Def. 56.1 Stmt. ¶¶ 31-34; Appell Decl. Ex. 8. Moreover, as noted above, he completed his 2016 radiation treatment without taking any leave, was working full time when the decision was made to let him go, and – insofar as the record discloses – never informed his employer that he had any additional treatment upcoming. Since plaintiff has failed to raise a genuine issue of material fact as to whether he "gave notice to the defendant of [his] intention to take leave," *Graziadio*, 817 F.3d at 424, his FMLA interference claim fails.

> **b.** ***Plaintiff Has Not Raised a Triable Issue of Fact as to the Fifth Element of His FMLA Interference Claim***

It is not enough for an FMLA plaintiff to establish that he notified his employer of his need for a leave; he must also show that he "was denied benefits to which [he] was entitled under the FMLA." *Graziadio,* 817 F.3d at 424. In this case – since JRM granted every leave request that plaintiff actually made – plaintiff's theory must be that his employer fired him to avoid any *future*

obligation to provide FMLA leave. *See* Opp. Mem. at 3-4.[11] Several courts in this Circuit have cautioned that claims of this nature should be considered retaliation claims, not interference claims, and must therefore be analyzed under the *McDonnell Douglas* burden shifting framework. *See, e.g.*, *LeClair v. Berkshire Union Free Sch. Dist.*, 2010 WL 4366897, at *6 (N.D.N.Y. Oct. 28, 2010) ("the Court finds that Plaintiff's theory of interference by termination is merely a retaliation theory in disguise"); *Yanklowski*, 794 F. Supp. 2d at 428 ("Furthermore, while she was disciplined and subsequently fired, allegedly for exercising her rights under the FMLA, courts in this circuit have consistently held that these types of claims constitute retaliation and not interference."); *Di Giovanna v. Beth Israel Medical Center*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009) ("this really is no more than an effort to dress Di Giovanna's retaliation claim in (barely) different clothing").

In this case, the distinction is immaterial. Even assuming the propriety of premising his FMLA interference claim on his termination, plaintiff's claim fails at summary judgment because he has not come forward with any evidence which would permit a jury to conclude that JRM terminated him for prohibited reasons. *See Sista*, 445 F.3d at 176 (affirming a grant of summary judgment to the defendant employer because, "[r]egardless of whether Sista asserts an 'interference' or a 'retaliation' claim," he "cannot show that [defendant] considered his FMLA leave and request to return a negative factor in its decision to terminate him").

It is "well-settled" that an employer who terminates an employee "is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless

---

[11] As noted above, plaintiff never expressly articulates this theory. However, the authorities on which he principally relies are all "interference by termination" cases. *See, e.g.*, *Debell*, 2011 WL 4710818, at *7-8 (quoting *Tambash v. St. Bonaventure Univ.*, 2004 WL 2191566, at *11 (W.D.N.Y. 2004)) ("Where an employer is aware that an employee may need to take FMLA leave, it would be inconsistent with the remedial purpose of the statute to allow an employer, motivated in part specifically to prevent the employee from obtaining leave under the FMLA, to terminate the individual before a more definitive request for leave could be made.").

of the leave." *Hill v. New York City Hous. Auth.*, 220 F. Supp. 3d 499, 506 (S.D.N.Y. 2016) (quoting *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011)). This is so because the "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." *Hill*, 220 F. Supp. 3d at 506 (quoting *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004)).

Plaintiff proffers two cases for the proposition that an employee's termination due to poor performance may give rise to an FMLA claim if the poor performance, in turn, was caused by an illness that would have entitled that employee to an FMLA leave: *Roberts v. AIG Glob. Inv. Corp.*, 2008 WL 4444004, at *4-5 (S.D.N.Y. Sept. 30, 2008) and *Woods*, 864 F.3d at 165. *See* Opp. Mem. at 6-7. Neither case is persuasive.

In *Roberts*, the plaintiff notified HR on July 22, 2004, that he "would have to take a leave-family medical leave because of a short-term disability." 2008 WL 4444004, at *2. His employer, AIG, told plaintiff that he "needed to be at work, that he could not take sick leave in the next ten days, and that he could not start his leave until he had filled out the appropriate paperwork, for which they set a deadline of August 5." *Id*. Thereafter, on August 2, 2004, Roberts submitted a "Notice and Proof of Claim for Disability Benefits" form to HR, followed by a "Request for Leave of Absence" form on August 3, 2004, indicating that he planned to take leave beginning August 12, 2004. *Id*. On August 3, 2004, Roberts missed work, and on August 5, 2004, after arriving late, he was terminated. *Id*. On these facts, the district court rejected AIG's argument "that it intended to fire Roberts anyway because of poor performance," holding that plaintiff had raised "triable issues as to whether AIG terminated Roberts for reasons related to his substantive entitlements under the FMLA." *Id.*, at *4.

Plaintiff relies heavily on the language following that holding:

> To the extent that some or all of Roberts's performance problems were the result of his several health problems, and AIG does not dispute that Roberts gave notice of his intention to take leave because of those health problems nor that Roberts was fired before he could take the protected leave to which he was requested and was otherwise entitled, a reasonable trier of fact could find that Roberts was terminated because of performance problems that resulted from the very medical condition that entitled him to FMLA leave.

*Roberts*, 2008 WL 4444004, at *4 (footnotes omitted). Importantly, however, Judge Lynch *rejected* the proposition that an FMLA plaintiff cannot be fired for poor performance caused by his medical condition: "The FMLA 'is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.'" *Id.*, at *5 n.19 (quoting *Sista*, 445 F.3d at 175).

As recently explained by Judge Castel, the question is not whether the employee's poor job performance was attributable to the same health issues that allegedly entitled him to FMLA leave; that "would require omniscience on the part of employers." *Hockenjos v. Metro. Transporation Auth.*, 2016 WL 2903269, at *8 (S.D.N.Y. May 18, 2016), *aff'd sub nom. Hockenjos v. MTA Metro-N. R.R.*, 695 F. App'x 15 (2d Cir. 2017). Rather, a poorly-performing employee may properly be terminated "so long as [his] *leave* did not constitute a factor in defendant's termination decision." *Id.* (emphasis added). Thus, plaintiff may not overcome JRM's summary judgment motion merely by raising an inference that his poor performance "was, in fact, caused by his medical condition." Opp. Mem. at 14.

*Woods* – a retaliation case brought by an employee who was fired twelve days after she returned from an FMLA leave – is even less helpful for plaintiff. At trial, the jury was instructed that it was the plaintiff's burden to establish "but for" causation – that is, that but for the exercise of her FMLA rights she would not have been fired:

> For you to determine that the plaintiff was terminated for taking FMLA leave, she must prove that the defendant would not have terminated her if she had not taken FMLA leave, but everything else had been the same.

*Woods*, 864 F.3d at 165. The jury was also instructed that the FMLA "does not protect an employee from performance problems caused by the conditions for which the FMLA leave is taken," and therefore that "a person can be fired for poor performance, even if that poor performance is due to the same root cause as the need for the leave." *Id.*

On appeal, plaintiff argued, and the Second Circuit agreed, that the causation instruction was error. The appellate court "defer[red] to the Labor Department's regulation implementing a 'negative factor' causation standard for FMLA retaliation claims" and held that an FMLA retaliation plaintiff need only establish that her exercise of her FMLA rights was a "motivating factor" in the employer's termination decision. *Woods*, 864 F.3d at 168-69. *See also Gordon v. City of New York,* 2018 WL 4681615, at *24 (S.D.N.Y. Sept. 28, 2018) (noting that *Woods* stands for the proposition that "a plaintiff need only show that FMLA leave was a 'negative factor' in the employer's decision to take an adverse action"). Woods did not challenge, and the Second Circuit did not discuss, the instruction concerning the employer's right to terminate an employee for poor performance "even if that poor performance is due to the same root cause as the need for the leave." *Woods*, 864 F.3d at 165. Thus, nothing in *Woods* permits an FMLA plaintiff to satisfy his burden at summary judgment by asserting that the poor performance that led to his termination was caused by a condition for which FMLA leave may have been available.

In the case at bar, defendant has proffered extensive evidence that plaintiff's employment was terminated due to his poor work performance, not to any request (or anticipated request) for FMLA leave. Plaintiff's performance issues were noted in 2015 – long before his condition worsened and required radiation treatment – and caused friction at that time between JRM and its client Blackstone, as well as within JRM's Blackstone team. Fuchs Decl. Exs. P, Q, R; 2015

Performance Review at 2; Reissman Dep. at 66:7-67:19, 157:3-13.[12] He continued to perform poorly into early 2016, leading to his removal from the Blackstone team and a series of warnings. *See* Fuchs Decl. Exs. K, N, U; Durrani Aff. ¶¶ 3-6. After giving plaintiff a "final chance," but observing no improvement in his performance, JRM terminated his employment in June 2016. Reissman Dep. at 95:2-96:6, 157:3-23; Levitt Dep. at 79:22-80:4.

Plaintiff, on the other hand, has submitted no evidence of any kind, direct or indirect – other than the timing of his termination – suggesting that his past and/or potential future requests for FMLA leave were a "negative factor" in JRM's decision to terminate him. Therefore, as in *Gordon*, 2018 WL 4681615, at *25, "no reasonable jury could conclude that [plaintiff's] FMLA request was a motivating factor in" JRM's termination of his employment. *See also Dearden*, 2017 WL 4084049, at *11 ("[t]he timing of events alone . . . cannot defeat summary judgment in the face of defendant's proffered legitimate reason") (citation omitted). Plaintiff has pointed to no document or testimony suggesting that Reissman, Levitt, or any other JRM decision-maker considered his alleged need for FMLA leave as "a negative factor in its decision to terminate him."

---

[12] The parties each highlight the elements of plaintiff's 2015 Performance Review helpful to their cause. *See* Def. Mem. at 7, 14; Opp. Mem. at 2, 14. To be sure, that review was not entirely negative; plaintiff's performance was rated satisfactory or above average in several areas. However, the mere existence of some positive elements in an underwhelming performance review does not render pretextual an employer's reliance on its negative elements in connection with its later termination of that employee. *See, e.g.*, *Yeger v. Inst. of Culinary Educ., Inc.*, 2017 WL 377936, at *11-13 (S.D.N.Y. Jan. 25, 2017) (observing, in an age and gender discrimination action, that "Plaintiff's selective citation of only the positive aspects of her performance reviews while ignoring the negative aspects of those same reviews does not support a rational inference of pretext").

*Sista*, 445 F.3d at 176.[13] Instead, as in *Woolf*, "the record includes extensive evidence that [he] was terminated for performance-based, non-pretextual reasons, and no evidence that his termination was motivated by his requests for, [or] use of, family or medical leave." *Woolf*, 2019 WL 1046656, at *18; *see also Hockenjos*, 2016 WL 2903269, at *7-8 (granting summary judgment to employer based on "overwhelming evidence" of plaintiff's poor performance and absence of evidence that FMLA leave was a factor in termination).

Plaintiff having failed to raise a genuine issue of material fact in support of either the fourth or the fifth elements of his FMLA interference claim, defendant is entitled to summary judgment on that claim.

## 2. ADA Accommodation Claim

Under 42 U.S.C. § 12112(b)(5)(A), a "covered entity" violates the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." To establish a *prima facie* failure-to-accommodate claim under the ADA, a plaintiff must show (1) that he is a "person with a disability under the meaning of the ADA," (2) that "an employer covered by the statute had notice of his disability," (3) that "with reasonable accommodation, plaintiff could perform the essential functions of the job at issue," and (4) that

---

[13] In paragraph 92 of his counter-statement of material facts, plaintiff asserts that "[i]n an e-mail from Mr. Reissman to Mr. Lievre, dated August 21, 2014, the day before the car service was set up for Mr. Lievre due to the difficulties he was having walking as a result of his cancer treatment, Mr. Reissman stated that Mr. Lievre is taking too much time to get work done and is 'embarrassing' JRM with the client." Pl. 56.1 Stmt. ¶ 92. Oddly, plaintiff did not provide the email itself to the Court in his summary judgment papers. Assuming that it exists, however, nothing about it suggests that plaintiff's potential exercise of his FMLA rights was a "motivating factor" in JRM's termination decision two years later. *Woods*, 864 F.3d at 168.

34

"the employer has refused to make such accommodations." *McBride*, 583 F.3d at 96-97 (citations omitted).

JRM does not seriously contest the first two elements of plaintiff's ADA accommodation claim, *see* Def. Mem. at 15-19, and the Court assumes, for summary judgment purposes, that plaintiff can satisfy those elements. However, plaintiff has failed to raise a genuine issue of material fact as to the third and fourth elements of the claim.

> ### a. Plaintiff Has Failed to Identify What Reasonable Accommodation Would Have Permitted Him to Perform the Essential Functions of His Job

"In the context of the ADA, reasonable accommodation may include, *inter alia*, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, 'reassignment to a vacant position.'" *McBride*, 583 F.3d at 97 (quoting 42 U.S.C. § 12111(9)(B)). "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment." *Id.* (citing *Jackan*, 205 F.3d at 566-67).

It is undisputed that JRM provided plaintiff some accommodations, including reimbursement for taxis to attend offsite "walk throughs," a car service to commute between work and home, permission to work from home when necessary, and the conversion of a women's bathroom into a large, ADA-compliant bathroom near plaintiff's office. Def. 56.1 Stmt. ¶¶ 39-44; Levitt Dep. at 80:13-82:23; Reissman Dep. at 177:3-179:4.

Plaintiff fails to identify any further accommodation which, if granted him, would have permitted him "to perform the essential functions of the job at issue." *McBride*, 583 F.3d at 96-97. Instead, he cites to Levitt's testimony about the "possible accommodations" for "an employee whose illness was interfering with his ability to work," which ranged from "providing a flexible

schedule or more comfortable chair through the FMLA leave options." Pl. 56.1 Stmt. ¶ 98; *see also* Levitt Dep. at 54:18-55:9. He also highlights Reissman's testimony that he did not recall offering plaintiff any specific accommodations after January 1, 2016, and did not assign anyone to "assist" plaintiff while he was undergoing treatment. Pl. 56.1 Stmt. ¶ 99; Reissman Dep. at 160:9-22. Plaintiff then argues that defendant violated the ADA because it "failed to offer any sort of accommodation" while Lievre was "doing the best he could and struggling while undergoing radiation." Opp. Mem. at 17.

Plaintiff's argument falls short, because it is his burden to show that there were reasonable accommodations *for him* to perform the essential functions of *his* job. *Cf. McBride*, 583 F.3d at 96-97. *See also Molina v. City of Rochester*, 764 F. App'x 49, 51 (2d Cir. 2019) ("Molina produced no evidence that (and does not describe how) he would be able to complete the essential functions of his job even with any of his proposed accommodations. His failure to accommodate claim thus fails as a matter of law."). Absent evidence that plaintiff could have performed his job if offered "a flexible schedule" or "a more comfortable chair," Pl. 56.1 Stmt. ¶ 98, Levitt's generic testimony concerning "possible" accommodations for hypothetical employees with hypothetical illnesses does not assist plaintiff in meeting that burden here.

Similarly, Reissman's alleged failure to assign anyone to "assist" plaintiff with his work cannot defeat JRM's summary judgment motion. Even assuming, *arguendo*, that such assistance would have improved plaintiff's output, it falls far beyond an employer's obligation to provide a "reasonable" accommodation. *Jacobson*, 2018 WL 6817064, at *28 ("An employer does not have to require another employee to repeat work done by a person with disabilities, particularly when this would reduce overall productivity."). The ADA, like the FMLA, "does not prevent an

employer from holding an employee accountable for poor job performance," even where the employee's disability caused the unacceptable job performance. *Id.*, at *16 (collecting cases).[14]

Because plaintiff has not met his burden to identify specific "reasonable accommodations" that would have allowed *him* to perform the essential functions of the job, summary judgment on his ADA accommodations claim is warranted. *Molina*, 764 F. App'x at 51 ("we agree with the District Court that Molina failed to identify a reasonable accommodation that would allow him to perform the essential functions of his job"); *Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 20 (2d Cir. 2017) (affirming grant of summary judgment in favor of a defendant where the plaintiff "failed to meet her burden of identifying an accommodation that would allow her to continue to perform all of the essential functions" of the job she once held); *Itzhaki v. Port Authority of New York & New Jersey*, 2017 WL 213808, at *5 (S.D.N.Y. Jan. 17, 2017) ("Itzhaki fails to identify any reasonable accommodation that would have allowed her to perform the essential functions of the Sergeant position with her alleged disability.").

### b. *Plaintiff Has Failed to Raise a Genuine Dispute of Material Fact Concerning Whether JRM Denied Him Any Accommodation*

Even if plaintiff had met his burden to identify a "reasonable accommodation" that would have enabled him to perform the essential functions of his job, he has failed to raise a triable issue of fact on the fourth element of his ADA accommodation claim: that he requested, and JRM denied, any reasonable accommodation. *See Vitti v. Macy's Inc.*, 758 F. App'x 153, 157-58 (2d Cir. 2018) ("In addition, Vitti fails to establish denial of a reasonable accommodation because she never requested one."). Plaintiff makes no effort to show that he requested any particular

---

[14] *See also Adams v. Rochester Gen. Hosp.*, 977 F. Supp. 226, 236 (W.D.N.Y. 1997) ("Discrimination under the ADA is not established if the disability caused unacceptable job performance."); *Ali v. Tribune Entm't Co.*, 1996 WL 384913, at *5 (S.D.N.Y. July 10, 1996) (referring to plaintiff's "unsatisfactory job performance as a result of her disabilities" as a "legitimate non-discriminatory reason[s] for its termination of the plaintiff").

accommodation, much less that JRM denied such a request. Instead, he argues that JRM was required to "act proactively and engage in an interactive process to accommodate" his disability because it "knew or reasonably should have known that [he] was disabled." Opp. Mem. at 15-17.

If a disability is "obvious – which is to say, if the employer knew or reasonably should have known that the employee was disabled," that employer may have a "duty reasonably to accommodate" the disability even if no specific request is made. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008). Even where a disability is obvious, however, the employee must still establish that "with reasonable accommodation, plaintiff could perform the essential functions of the job at issue," and that "the employer has refused to make such accommodations." *McBride*, 583 F.3d at 96-97.

Plaintiff has failed to raise a genuine dispute of material fact on this issue. To be sure, JRM was aware of some of plaintiff's health issues, including his underlying illness, its recurrence, and his radiation treatment in April 2016. However, mere awareness of an employee's health issues does not translate into an awareness of that employee's need for additional accommodations under the ADA. Instead, as in *Jacobson*, where the record demonstrates that "every accommodation request that Plaintiff made with respect to [his] cancer treatment was granted," and he has failed to identify any reasonable accommodation he was not afforded prior to his termination for poor work performance, summary judgment is warranted. *See Jacobson*, 2018 WL 6817064, at *29.[15]

Nor may plaintiff rely on JRM's asserted failure to engage in an interactive process with him to determine what accommodations, if any, might have been afforded. Opp. Mem. at 15-17.

_____

[15] This point distinguishes the case at hand from *Brady*, 531 F.3d 127, which, as the Second Circuit has explained, was "premised on the fact that the plaintiff had sufficiently demonstrated that he was, at least with the aid of some reasonable accommodation, capable of performing the essential functions of the position at issue." *McBride*, 583 F.3d at 102.

"The Second Circuit has held that under the ADA, failure to engage in an interactive process does not form the basis of a disability discrimination claim in the absence of evidence that a reasonable accommodation was possible." *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 420 (S.D.N.Y. 2014); *McBride*, 583 F.3d at 101 ("[A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue."). Once again, therefore, plaintiff's ADA claim founders on his inability to show that there was "some identified accommodation" that would have allowed him to satisfactorily perform the essential functions of his job but that JRM failed to provide.

### 3. State Law Claims

Plaintiff's remaining claims are brought under the NYSHRL and NYCHRL. As in *Woolf*, "no party has addressed the appropriateness of the exercise of supplemental jurisdiction over the remaining state law claims in the event that [plaintiff's] federal claims do not survive summary judgment." 2019 WL 1046656, at *21. Although "both sides have had an opportunity to be heard," neither of them "has urged that economy, convenience, fairness or comity weigh in favor of exercising supplemental jurisdiction." *Id.* (citing *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 82-83 (2d Cir. 2018)).

A district court "may decline to exercise supplemental jurisdiction over a claim . . . [when it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In the "usual case" in which "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law

claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). The "usual case" rule applies with full force to ADA and FMLA actions. *See, e.g.*, *O'Reilly*, 173 F. App'x at 23-24 (finding no abuse of discretion where the district court declined to exercise supplemental jurisdiction over a plaintiff's NYCHRL and NYSHRL claims after granting summary judgment on her ADA and FMLA claims); *Maysonet v. Valley Nat'l Bank*, 2019 WL 1368327, at *6 (S.D.N.Y. Mar. 25, 2019) ("Plaintiff's NYSHRL and NYCHRL claims are best addressed by state courts, and the Court thus declines to exercise jurisdiction over those claims."); *Woolf*, 2019 WL 1046656, at *21 ("Because the remaining claims are brought under New York law and turn on New York-specific requirements, principles of judicial economy, fairness, convenience and comity will be served best by declining to exercise supplemental jurisdiction over the remaining state law claims and, accordingly, all such claims are dismissed."); *Sefovic v. Mem'l Sloan Kettering Cancer Ctr.*, 2017 WL 3668845, at *8 (S.D.N.Y. Aug. 23, 2017) ("Because the Court grants Defendants' motion for summary judgment with respect to Sefovic's federal-law claims, the Court declines to exercise supplemental jurisdiction over his NYSHRL and NYCHRL claims.").

The same result is appropriate here, especially in light of plaintiff's assertion, in his opposition brief, that his "NYSHRL and NYCHRL claims are broader" than his ADA claims, Opp. Mem. at 17-24, and the fact that they can be refiled in state court without running afoul of the

statute of limitations.[16] Accordingly, "[p]laintiff's NYSHRL and NYCHRL claims are best addressed by state courts," *Maysonet*, 2019 WL 1368327, at \*6, and this Court declines to exercise supplemental jurisdiction.

## III. CONCLUSION

Defendant's motion for summary judgment as to plaintiff's claims under the ADA and FMLA is GRANTED, and those claims are DISMISSED WITH PREJUDICE. Plaintiff's claims under the NYSHRL and NYCHRL are DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is respectfully directed (1) to amend the caption of this action to reflect that "Henry T. Lievre and Deborah M Lievre, as co-executors of the estate of Henry E. Lievre" have been substituted as plaintiffs for Henry E. Lievre (*see* Dkt. No. 19), and (2) to enter judgment in favor of defendant and close the case.

Dated: New York, New York  
September 20, 2019

**SO ORDERED.**

**BARBARA MOSES**  
**United States Magistrate Judge**

---

[16] *See* 28 U.S.C. § 1367(d) (tolling the statute of limitations applicable to any claim over which a federal court had, but later declined to exercise, supplemental jurisdiction, for the period the claim is pending in federal court and for a period of 30 days after the claim is dismissed, unless state law provides for a longer tolling period); N.Y. C.P.L.R. § 205(a) ("If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff, or, if the plaintiff dies, and the cause of action survives, his or her executor or administrator, may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination . . . .").